UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

FILED

OCT 13 2015

U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

| | |
|---|---|
| **WEIRTON MEDICAL CENTER, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) |
| | ) |
| **COMMUNITY HEALTH SYSTEMS, INC.,** | ) |
| **QUORUM HEALTH RESOURCES, LLC,** | ) |
| **STEPHEN MILLER, MICHAEL ROLPH,** | ) |
| **ROBERT LOVELL, ROBERT VENTO,** | ) |
| **DANIEL HAMMAN, JOHN WALTKO,** | |
| | |
| **Defendants.** | |

5:15-cv-132 Bailey

## COMPLAINT

Plaintiff, Weirton Medical Center, Inc., by its undersigned counsel, files this Complaint against Community Health Systems, Inc., Quorum Health Resources, LLC, Stephen Miller, Michael Rolph, Robert Lovell, Robert Vento, Daniel Hamman, and John Waltko, and in support thereof avers as follows:

## Introduction

1.      This action seeks recourse for a fraudulent "bait-and-switch" scheme perpetrated by the Defendants against Weirton Medical Center, Inc. ("WMC" or "Hospital"), a small community hospital located in Weirton, West Virginia that was in financial distress and in need of financial assistance or professional hospital management services.

2.      Defendants Community Health Systems, Inc. and Quorum Health Resources, LLC held themselves out as having the requisite skills and financing needed to restore the Hospital to profitability, but rather than helping the Hospital, they preyed upon the Hospital in its time of need by looting it and leaving it on the verge of insolvency. As such, this case has implications

beyond the harm sustained by WMC resulting from the Defendants' misconduct; it is an action designed to prevent such interlopers from taking advantage of other small, distressed hospitals in West Virginia through deceptive business practices and fraudulent representations.

3.      The fraudulent scheme, secured by dangling a potential investment in the Hospital and by misrepresenting the very nature of the engagement, the parties involved and their capabilities, was designed by Defendants Community Health Systems, Inc. and Quorum Health Resources, LLC to take advantage of a financially distressed hospital.   The scheme was implemented, concealed and perpetuated by their employees or representatives, Defendants Miller, Rolph, Lovell, Vento, and Hamman.

## The Parties

4.      Plaintiff WMC is a corporation organized and existing under the laws of West Virginia with its principal place of business in Weirton, West Virginia.

5.      Defendant Quorum Health Resources, Inc. ("Quorum") is a limited liability company formed in Delaware with a principal place of business located at 4000 Meridian Blvd, Franklin, TN 36067.

6.      Defendant Community Health Systems, Inc. ("CHS") is a Delaware corporation with its principal place of business in Tennessee.   Upon information and belief, CHS is the parent company of Quorum and QHR Intensive Resources, LLC.   CHS owns four or more Hospitals in the State of West Virginia.   CHS further operates through and solicits business for its subsidiaries, including Quorum and QHR Intensive Resources, LLC in West Virginia.

7.      Defendant Stephen Miller is an individual residing in Plano, Texas.   Mr. Miller was the Interim-CFO at WMC from November 2009 through December 2010.

8.      Defendant Michael Rolph is an individual residing at 1729 Caribbean Dr., Sarasota, Florida. Mr. Rolph was the Interim-CFO at WMC in 2011.

9.      Defendant Robert Lovell is an individual residing in New York. Mr. Lovell was the Interim-COO at WMC in 2010 and 2011.

10.     Defendant Robert Vento is an individual residing in Nashville, Tennessee. Mr. Vento is an officer of Quorum.

11.     Defendant Dan Hamman is an individual residing in Nashville, Tennessee. Upon information and belief, Mr. Hamman is an officer of Quorum or its affiliates.

### Jurisdiction and Venue

12.     This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1332. The matter in controversy exceeds the sum of $75,000 exclusive of interest and costs, and complete diversity of citizenship exists between the parties. WMC is a corporation organized and existing under the laws of West Virginia with its principal place of business in Weirton, West Virginia and none of the Defendants are citizens of this State.

13.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in Weirton, West Virginia.

### Background Facts

14.     In 2009, WMC was a financially distressed 238 bed, acute-care hospital.

15.     By June 30, 2009, the close of the Hospital's 2009 fiscal year (which runs from July 1 through June 30), the Hospital had an operating loss of approximately $3.4 million.

16.     The Hospital's Board and its then CEO recognized that the Hospital on its own was unable to turn around the Hospital's deteriorating financial condition and that significant

changes were necessary to restore the Hospital to profitability.  Chief among the Hospital's concerns were  increasing its revenue and the recruitment of physicians.

17.     The then CEO began searching for hospitals and other health care organizations with which to partner or merge.  Efforts to partner or merge with other local or regional hospitals were unsuccessful.

18.     One of the potential partners, CHS, which upon information and belief actively solicits business for its affiliates, including Quorum, advised WMC to work with Quorum.

19.     Upon information and belief, Doug Johnson, an individual who unbeknownst to WMC was employed by both CHS and QHR Intensive Resources, LLC, set up a meeting between Quorum and WMC on October 8, 2009.

20.     In this meeting with WMC, Quorum's officers, including Cindy Wise, Vice President, Business Development, and Robert Vento, Senior Vice President, Operations, advised WMC that Quorum could stabilize WMC's financial position, and that to do so WMC needed a revenue cycle assessment.

21.     These individuals worked to delay and prevent WMC from moving forward with a plan to have a different company review WMC's revenue cycle, so as to "let [Quorum] to review the entire picture."

22.     On October 29, 2009, WMC and Quorum met again.  Quorum made presentations entitled, "Strategic Options for the Future" and "Opportunities to Improve Weirton's Value."

23.     Through these presentations and discussions, Quorum and Mr. Vento expressed that Quorum was interested in an equity position with WMC and touted that Quorum was an experienced company, had a proven track record and had deep pockets both in cash and talent.

24.     Quorum and Mr. Vento sold WMC on the concept that partnering with Quorum "position[s] a hospital for future financial success."

25.     Against this backdrop, Quorum and Mr. Vento convinced the Hospital to place Stephen Miller, an employee or independent contractor of Quorum,  in the position of Interim-CFO at WMC.

26.     In November of 2009, WMC entered into an "Interim Support Services from Quorum Health Resources, LLC" ("Interim-Support Agreement").  The agreement was signed by Robert A. Vento, Senior Vice President, Quorum Health Resources, LLC.

27.     Pursuant to the November 2009 "Interim Support Agreement", Quorum agreed to provide the Hospital with "interim" support services, including the services of the CFO.

28.     The Interim Support Agreement provided that the CFO shall function at the Hospital as a "borrowed employee" to the Hospital's Governing Board (the "Board"), and that Mr. Miller would "at all times while serving the Hospital, be under the direction, control and supervision of the Hospital's CEO."

29.     Quorum knowingly and falsely represented that Mr. Miller would function as a "borrowed employee" to the Board, and that he would "at all times while serving the Hospital, be under the direction, control and supervision of the Hospital's CEO."

30.     Upon information and belief, Quorum never intended Mr. Miller to act as a borrowed employee and never intended that he would truly be under the direction, control and supervision of the Hospital.  Quorum intended that Mr. Miller would report to, be controlled by and be loyal to Quorum.  Unbeknownst to the Hospital, Mr. Miller was a member of Quorum's sales team seeking to land a lucrative "turnaround" engagement at the Hospital even though he

was purportedly in the position of CFO at the Hospital—charged with protecting the Hospital's finances and providing his counsel and advice to the Hospital.

31.     Upon information and belief, Mr. Miller's placement at the Hospital and Quorum's discussions concerning a potential investment in the Hospital were part of CHS and Quorum's scheme to obtain a contract for "turnaround services" for its subsidiary, QHR Intensive Resources, LLC.

32.     Quorum further represented and warranted that Mr. Miller is (or will be) "qualified to provide those services that are ordinarily required of an acute care hospital's CFO."

33.     Quorum knowingly and falsely represented and warranted that Mr. Miller had the requisite skills and experience to act as the CFO of a West Virginia Hospital.  Mr. Miller was not experienced as represented and warranted.

34.     After purportedly conducting its due-diligence, Quorum told WMC that we can't own you or buy you, but we will do a "turnaround" after which Quorum again represented that it might be interested in investing in WMC.

35.     To obtain this lucrative "turnaround" engagement, Quorum and Mr. Vento continued to falsely advise WMC that working with Quorum would position the Hospital for future financial success, and that Quorum would help recruit physicians.

36.     Quorum and Mr. Vento falsely advised the Hospital that Quorum would help WMC by "improving and stabilizing financial performance."

37.     Quorum and Mr. Vento  falsely represented that Quorum possessed extensive knowledge and experience working with West Virginia state regulatory and reimbursement requirements.

38.     Quorum and Mr. Vento falsely represented that QHR had a deep bench of physicians and other professionals from which to recruit.

39.     Quorum held itself out as a company that goes "beyond the limits of traditional consulting to **results-oriented** implementation" and touted that Quorum's primary offerings as including "financial performance improvement and revenue enhancement services."

40.     Quorum knew that one of the Hospital's primary goals in hiring a turnaround specialist was to recruit physicians, and Quorum represented that it had a deep bench of physicians and the ability to recruit physicians.  Quorum represented that it was familiar with the Hospital's vacancies and that it was confident that it could come in and address those vacancies.

41.     In "Talking Points" supplied by Quorum and Vento to the Hospital on April 28, 2010 to advise the Hospital community of the turnaround engagement into which Quorum and the Hospital were entering, Mr. Vento and Quorum reaffirmed that Quorum had "extensive knowledge of the healthcare industry experience working with state and federal regulatory and reimbursement requirements."

42.     Contrary to the "Talking Points" and the expectations of the Hospital, Quorum did not intend to be a party to an agreement with the Hospital.  Instead, Quorum substituted QHR Intensive Resources, LLC for itself.

43.     Quorum and Mr. Vento, who was a Senior Vice President of Quorum, falsely represented and advised WMC that having an agreement with QHR Intensive Resources, LLC was the same as having one with Quorum and that it made no difference.

44.     Based on the promises and representation of Quorum, The Hospital moved forward and entered into an "Agreement For Hospital Administration Services" with effective May 1, 2010.

45.     Quorum and Mr. Vento purposefully and intentionally obfuscated the corporate realities of Quorum and QHR Intensive Resources, LLC.  Upon information and belief, to further obfuscate and to alleviate any concern that might arise by the use of QHR Intensive Resources, LLC, Mr. Vento executed the agreement under the title of Senior Vice President of  QHR Intensive Resources,  LLC.  Upon information and belief, Mr. Vento did not hold that position.

46.     Though Quorum and Mr. Vento represented the engagement as a "turnaround" engagement and advised WMC that use of QHR Intensive Resources, LLC as the company executing the engagement did not alter the engagement, Mr. Vento knew that QHR Intensive Resources, LLC was a consulting company and that it was precluded by Quorum and CHS from actually implementing the very goals and objectives that had been established between WMC and Quorum.

47.     Quorum used these representations and a contract of adhesion to entrap WMC into a fictitious "turnaround" engagement with Quorum's and CHS' affiliate QHR Intensive Resources, LLC.

48.     Quorum and Mr. Vento now admit that QHR Intensive Resources, LLC was prohibited from recruiting physicians and that there was no deep bench (or in fact any bench) of physicians from which to recruit.

49.     In addition, whereas, Quorum holds itself out as going beyond the limits of traditional consulting to **results-oriented** implementation, the "turnaround" agreement with QHR Intensive Resources, LLC, according to Mr. Vento now, had no such implementation deliverables.

50.     Upon information and belief, CHS and Quorum have created this confusing and deceptive array of corporate entities to aid them in their bait-and-switch schemes.  Distressed

hospitals are lured and entrapped into financially draining arrangements under the guise of CHS' and/or Quorum's and CHS' affirmative representations of potential investments, results-oriented implementations, and physician recruiting, but are instead placed with a subsidiary, which is devoid of these skills and expertise and which is prohibited by its corporate parents from carrying out such objectives.

51.     Each of the individual defendants had a duty of honesty to the Hospital.  Instead of meeting that duty, each of the individuals furthered Quorum's bait-and-switch in order to keep WMC in this meaningless "turnaround" engagement and furthered the interests of CHS and Quorum by concealing the truth, and making false representations concerning the objectives and effectiveness of the so-called "turnaround"  engagement.

52.     Mr. Miller lacked the necessary experience and skills to assume the position of CFO at the Hospital.  Mr. Miller's lack of skill and experience in West Virginia harmed WMC in responding to the yearly rate decision issued by the West Virginia Health Care Authority in 2010.

53.     Mr. Miller, internally within Quorum, expressed his lack of knowledge and experience and inquired within the Quorum community whether anyone had a good understanding of this process within the state of West Virginia and whether anyone could help implement the rate decision in a **strategic manner.**" Quorum, despite its representations to the contrary, had no such base of knowledge or experience.

54.     Mr. Waltko, who is an employee of Quorum, had no such experience in West Virginia reimbursements for hospitals such as WMC or with the West Virginia Health Care Authority.  However,  he rashly and recklessly determined that the Hospital needed a "QRATE," a service sold by Quorum, to set the prices on its chargemaster.

55.     Mr. Miller, breaching his fiduciary duty to the Hospital, undertook no further meaningful inquiry as to appropriateness of Quorum's and Mr. Waltko's direction and did no further independent research or analysis to determine the proper manner to implement the rate increase.  Instead, he took his direction from Quorum and engaged Quorum to undertake a QRATE analysis to strategically price the Hospital's chargemaster.

56.     QRATE is a budgeting tool not a strategic pricing tool.  QRATE was the wrong tool for the job and it did not take into account, as is the standard in West Virginia, the rates available to the Hospital under its managed care contracts.

57.     As a direct result, the prices on the Hospital's chargemaster were set without any regard for the rates available under its managed care contracts—the standard in West Virginia—and the Hospital received less than that to which it was entitled for the services it performed.

58.     Robert Lovell, who was placed at WMC as the Interim-COO, reported to, took direction from, and was supervised by Quorum and/or its affiliates. Mr. Lovell contrary to the warrants and representations made to WMC was not a "borrowed employee" and had no experience in West Virginia.

59.     In January of 2011, Michael Rolph replaced Stephen Miller as the Interim-CFO at WMC.

60.     Mr. Rolph was represented to be a "borrowed employee" reporting to the Hospital's Board and under the direction, supervision and control of the Hospital.  However, as was the case with Mr. Miller, Mr. Rolph reported to and took direction from Dan Hamman of Quorum.

61.     Mr. Rolph had no experience in West Virginia or with the West Virginia Health Care Authority.

62.     Though, according Mr. Rolph, he knew and understood that WMC's chargemaster needed to be modified to take advantage of the managed care contracts and that WMC was leaving reimbursements on the table, Mr. Rolph, ignored his fiduciary duty to the Hospital by, among other things, not taking action to correct this deficiency, and by knowingly allowing and causing WMC to receive less money than that to which it was entitled for the medical services it was rendering during his tenure as CFO.

63.     Despite having assured the Hospital that the people Quorum placed at the highest echelons of the Hospital, including in the positions of CFO and COO, would report to and be controlled by the Hospital, Quorum ensured that it maintained control over these individuals and used them to ensure continued payments from WMC, to disguise the true state of the Hospital's finances, and to falsely and recklessly present such information to the Hospital.

64.     By way of example, Quorum, Dan Hamman and Michael Rolph improperly modified the long-established method for booking the Hospital's accounts receivable at the Hospital.  They did this in a manner that violated generally accepted accounting practices, and without any rational basis.  In so doing, these Defendants made the Hospital's finances appear to be improving and gave the Hospital a false impression of the effects of the so-called "turnaround" engagement.

65.     Upon information and belief, Quorum, Dan Hamman, Mr. Lovell and Mr. Rolph presented these fictitious financial numbers to the Board to deflect the Hospital's concerns that the "turnaround" engagement was not succeeding, to entice the Hospital into extending the engagement, and to prevent the engagement's termination.

66.     This improper  accounting resulted in millions of dollars of write-offs by WMC in 2011 and 2012.

67. In the same light, Quorum, Mr. Hamman and Mr. Rolph consistently over estimated and falsely and recklessly represented to the Hospital's Board purported savings from their activities and the additional revenue that would be generated by the renegotiation of the Hospital's managed care contracts.

68. Upon information and belief, Quorum utilizes the same or similar deceptive activities with other distressed Hospitals to obtain extended contracts and/or to maintain existing contracts.

69. The Hospital's inquiries to Mr. Hamman and Mr. Rolph, as well as others, regarding why the additional reimbursement from the managed care contracts was not materializing were met with excuses and delay and went unanswered.

70. Unbeknownst to the Hospital, Quorum instructed its employees and others not to provide information to the Hospital, including the modeling and work papers upon which Mr. Vento, Mr. Hamman and Mr. Rolph would presumably have had to base their revenue estimates—particularly, if they were providing anything more than pure fiction to the Hospital.

71. Upon information and belief, this information was withheld and the Hospital's accounting practices were altered in an attempt to maintain and extend the fraudulent "turnaround" engagement.

72. Upon information and belief, CHS controls and directs the actions of its subsidiaries.

73. As a result of CHS, Quorum and the other Defendants, the Hospital expended substantial resources on a fictitious "turnaround" engagement with a purported subsidiary of CHS and Quorum, wasted resources and assets, lost valuable time and opportunities to recruit physicians, and suffered further and unnecessary deterioration of its finances.

## COUNT I
### (Fraud and Misrepresentation As Against All Defendants Except Waltko)

74.     WMC realleges and incorporates Paragraphs 1 through 73 above as if fully set forth herein.

75.     As discussed in detail above, Defendants intentionally and by design misrepresented material facts, created false impressions, and concealed material information, in order to, induce and entrap WMC, to obtain an undue advantage over WMC, and to extract millions of dollars from WMC.

76.     WMC reasonably and justifiably relied to its detriment on Quorum's and Vento's false representations concerning the parties with which it was transacting business, including among others, the skills, abilities, resources and limitations of Quorum and its subsidiaries, as well as the objectives, goals and scope of the financial "turnaround" engagement.

77.     WMC reasonably relied upon Quorum's false representations made concerning the skills, experience and loyalties of the Interim-CFOs and the nature of the relationship that those CFOs would have with the Hospital.

78.     WMC reasonably and justifiably relied to its detriment on the false financial and project status information provided by Mr. Rolph, Mr. Miller, Mr. Lovell, Mr. Vento and Mr. Hamman, as well as the silence of the other Defendants named herein, by, among other things, continuing to make payments to Quorum's affiliates, entering into contracts of adhesion with Quorum's affiliates and the wasting of valuable resources and assets on a fictitious turnaround engagement.

79.     By way of the Defendants' misrepresentations, Defendants defrauded WMC into a false "turnaround" engagement, extracted millions of dollars from the Hospital, and delayed the

Hospital's termination of that engagement and its ability to recover from the incompetence of the individuals placed by Quorum at the Hospital.

80.     WMC was damaged as a direct result of its reliance on the Defendants' false representations and active concealment of material information.

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., demands judgment in its favor against the Defendants in  an amount in excess of $75,000, along with costs, interest, attorney's fees where allowable by law, and any such other and further relief as the Court deems proper and just under the circumstances.

## COUNT II
### (Promissory/Equitable Estoppel As Against CHS and Quorum)

81.     WMC incorporates by reference paragraphs 1 through 80 above as if the same were set forth herein at length.

82.     Quorum, by and through Vento and others, expressly, or by necessary implication, promised in exchange for payments made by WMC to Quorum and/or its affiliates the implementation of a financial "turnaround" would occur at the Hospital and that this turnaround would include as primary objectives the recruitment of physicians and a top to bottom review and corrections of the Hospital's revenue cycle.

83.     Quorum intended that these promises would induce action on the part of WMC, including the engagement of Quorum's affiliates and the placement of Quorum's personnel or agents in the fiduciary positions of CFO and COO at the Hospital.

84.     WMC reasonably and justifiably relied on Defendants' promises, misleading words, actions and silence, by, *inter alia*, entering into  an illusory "turnaround" engagement, making payments to Quorum's subsidiaries, and by foregoing opportunities to retain the

"turnaround" and pricing services of competent professionals, seeking debt relief by other means, and the hiring its own Chief Financial Officer and Chief Operating Officer.

85.     Accordingly, the interest of justice can only be served by placing WMC back in the place it would have been but for these promises and by the restitution of all ill-gotten gains by CHS, Quorum and the companies they control.

86.     Upon information and belief, CHS was aware of, supported and controlled Quorum's business practices and actions.

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., demands judgment in its favor against Defendants, CHS and Quorum, and seeks damages in an amount in excess of $75,000, along with costs, interest, attorney's fees where allowable by law, and any such other and further relief as the Court deems proper and just under the circumstances.

## COUNT III
**(Breach of Fiduciary Duties and Confidential Relationships As Against Rolph, Lovell and Miller)**

87.     WMC realleges and incorporates Paragraphs 1 through 86 above as if fully set forth herein.

88.     Mr. Miller, Mr. Lovell and Mr. Rolph assumed positions of confidence and trust at the Hospital by accepting roles as Interim-CFOs and COO.

89.     Mr. Miller and Mr. Rolph represented that they had experience and expertise to act in the positions of CFO and Mr. Lovell represented that he had experience and expertise in the position of COO.

90.     The positions of CFO and COO inherently require a special relationship of trust and confidence.

91.     The positions of CFO and COO necessarily carry the fiduciary duties of honesty, loyalty and utmost care requiring that those assuming the positions of CFO and COO are informed and act knowledgeably and honestly in making decisions, giving advice and reporting to the Hospital.

92.     As CFOs, Mr. Rolph and Mr. Miller, and as COO, Mr. Lovell, each during their respective tenure assumed day to day control of the Hospital's finances and had a duty to act for the benefit of the Hospital.  Each of these individual had independent duties of good faith, candor, obedience, loyalty and care to WMC in the execution of their roles as officers at WMC. Mr. Miller and Mr. Rolph had the duty to act with the utmost care in discharging these duties to the Hospital.

93.     Mr. Miller, Mr. Lovell and Mr. Rolph knew at all times that the Hospital relied on their expertise, advise and truthfulness in the professional services they provided.

94.     Mr. Rolph, Mr. Lovell and Mr. Miller breached these fiduciary duties by engaging in the conduct described above, which was grossly negligent, reckless, dishonest, disloyal and a betrayal of the trust and confidence of the Hospital.

95.     As a direct and proximate result of these breaches of fiduciary duties, the Hospital suffered significant damages and its assets were wasted.

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., demands judgment in its favor against Defendants, Stephen Miller, Robert Lovell and Michael Rolph, for damages in  an amount in excess of $75,000, along with costs, interest, attorney's fees where allowable by law, and any such other and further relief as the Court deems proper and just under the circumstances.

## COUNT IV
### (Aiding and Abetting Breach of Fiduciary Duty Against Quorum, Vento and Hamman)

96.     WMC realleges and incorporates Paragraphs 1 though 95 above as if fully set forth herein.

97.     Quorum and the individual Defendants, Mr. Hamman and Mr. Vento, actively and knowingly caused and/or participated in the breach of confidence and breach of fiduciary duties by Mr. Rolph, Mr. Lovell and Mr. Miller.  They did this through their active direction and control of these individuals and their utilization of these individuals for their own purposes and to benefit the interests of Quorum.

98.     Upon information and belief, Quorum, Mr. Hamman and Mr. Vento utilized these individuals to extract payments from the Hospital that otherwise would not have made and to have these payments made ahead of more critical needs of the Hospital.

99.     Upon information and belief, Quorum, Mr. Hamman, Mr. Vento and others, utilized these individuals and the positions they held to obtain information from the Hospital to aid Quorum or its affiliates in the negotiation of disputes and agreements with the Hospital.

100.    Upon information and belief, CHS was aware of and supported Quorum's business practices and actions.

101.    Upon information and belief, Quorum through Mr. Hamman, Mr. Vento and others, utilized these individuals and their positions to obtain and in an attempt to extend the "turnaround" engagement and/or to prevent the Hospital from taking action to end the "turnaround" engagement earlier than it did.

102.    The Hospital was financially harmed and damaged as a direct result of the breach of fiduciary duties and improper acts in which Quorum, Mr. Vento and Mr. Hamman actively participated in these breaches.

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., demands judgment in its favor against Defendants, CHS, Quorum , Vento and Hamman, for damages in  an amount in excess of $75,000, along with costs, interest, attorney's fees where allowable by law, and any such other and further relief as the Court deems proper and just under the circumstances.

## COUNT V

### (Tort of Outrage Against All Defendants Except Waltko)

103.    WMC incorporates by reference Paragraphs 1 through 102 of this Complaint as though the same were set forth at length herein.

104.    The conduct of Defendants, as described herein, was extreme and outrageous and was done intentionally, recklessly and deceptively and beyond all bounds of decency in the healthcare or commercial industries.

105.    The conduct of Defendants, as described herein, resulted in financial harm to WMC that is so severe and profound that no corporate organization could endure or survive it.

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., demands judgment in its favor and against Quorum, and seeks damages in an amount in excess of $75,000, punitive damages, along with costs, interest, attorney's fees where allowable by law, and any other such and further relief as the Court deems proper and just under the circumstances.

### COUNT VI
### (Negligence As Against Quorum, Miller, Rolph and Waltko)

106.    WMC realleges and incorporates Paragraphs 1 though 105 above as if fully set forth herein.

107.    Quorum and the individual Defendants were at all times professionals holding themselves out has having specialized hospital management, regulatory and reimbursements, financial skills, and "turnaround" skills.

108.    Quorum and the individual Defendants were entrusted by the Hospital to provide such services, to counsel and advise the Hospital with respect to the management of the Hospital, its finances and the recruitment of physicians.

109.    As professionals providing professional services to the Hospital, Quorum and the individual Defendants owed duties to the Hospital to exercise reasonable care and follow accepted standards in the services they provided to the Hospital.

110.    Quorum, Waltko, Miller and Rolph provided advice in the pricing of the Hospital's chargemaster.

111.    The advice given and the actions and inactions of these Defendants in pricing the Hospital's chargemaster in 2010 failed to meet industry standard causing the Hospital's chargemaster to be improperly priced and resulted in significant financial harm to the Hospital.

112.    Defendants further compounded this negligence by failing to correct the deficiencies they caused in the pricing of the chargemaster and by failing to properly price the chargemaster after the renegotiation of the Hospital's managed care contracts as any reasonably competent CFO would.

113.   But for the professionally negligent conduct of these Defendants, the Hospital would not have suffered the injuries, damages, and losses suffered.

114.   Defendants' negligent conduct was a direct, substantial and proximate cause of the damages suffered by the Hospital.

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., demands judgment in its favor and against Defendants, and seeks damages in an amount in excess of $75,000, punitive damages, along with costs, interest, attorney's fees where allowable by law, and any other such and further relief as the Court deems proper and just under the circumstances.

## COUNT VII
### (Negligent Misrepresentation Against All Defendants)

115.   WMC realleges and incorporates Paragraphs 1 through 114 above as if fully set forth herein.

116.   As discussed in detail above, Defendants misrepresented material facts, created false impressions, and concealed material information with the knowledge that WMC would rely upon the false representations and the absence of the concealed material information.

117.   Defendants either knew or should have known that the representations concerning the turnaround engagement, the financial condition of the Hospital, and the revenue to be gained through the purported efforts of Quorum and its affiliates were either false or unreliable and that the Hospital would reasonably and foreseeably rely upon these representations.

118.   WMC did reasonably and justifiably rely upon Defendants' false representations made concerning the skills, experience and loyalties of the Interim-CFOs and the true nature of the relationship that those CFOs would have with the Hospital.

119.   WMC reasonably and justifiably relied to its detriment on the false financial and project status information provided by Mr. Rolph, Mr. Vento and Mr. Hamman, as well as the silence of the other Defendants named herein, by, among other things, continuing to make payments to Quorum and/or its affiliates, entering into contracts of adhesion with Quorum's affiliates and wasting valuable resources and assets on a fictitious turnaround engagement.

120.   WMC was damaged as a direct result of its reliance on the Defendants' false representations and active concealment of material information.

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., demands judgment in its favor against the Defendants in  an amount in excess of $75,000, along with costs, interest, attorney's fees where allowable by law, and any such other and further relief as the Court deems proper and just under the circumstances.

### COUNT VIII
### (Civil Conspiracy Against All Defendants)

121.   WMC incorporates by reference Paragraphs 1 through 120 of this Complaint as though the same were set forth at length herein.

122.   Upon information and belief, Defendants have acted in combination in pursuing a common purpose to perform the aforementioned unlawful acts and /or lawful acts for an unlawful purpose, making Defendants liable and responsible for their own wrongful acts against WMC as well as for the wrongful conduct of the others acting in concert and conspiracy with them.

123.   More specifically, Defendants acted in combination in pursing and maintaining a bait-and-switch perpetrated against the Hospital to extract millions of dollars of compensation and through the placement of their agents in the Hospital's executive suite under false pretenses,

through deceptive and improper accounting practices, and through the false reporting and misrepresentations described herein.

124.    Defendants acted with malice or intent to injure the Hospital without justification.

125.    As a direct and proximate result of the wrongful conduct of Defendants, the Defendants caused WMC to waste its valuable financial resources and to suffer the loss of money to which it was entitled.

126.    Defendants' actions were willful, wanton, outrageous and malicious and warrant the entry of punitive damages.

WHEREFORE, Plaintiff, Weirton Medical Center, Inc., demands judgment in its favor and against Defendants, and seeks damages in an amount in excess of $75,000, punitive damages, along with costs, interest, attorney's fees where allowable by law, and any other such and further relief as the Court deems proper and just under the circumstances.

**Plaintiff demands a trial by jury for all claims so triable.**

Respectfully submitted,

By: /s/

Patrick S. Casey (WV Bar No. 668)
Sandra M. Chapman (WV Bar No. 701)
CASEY & CHAPMAN, PLLC
1140 Chapline Street
Wheeling, WV 26003
(304) 231-2405
(866) 296-2591 (fax)

Dated: October 13, 2015
2163468.v1

Attorneys for Plaintiff,
Weirton Medical Center, Inc.